**David H. STUART and Richard A. Whitaker, Plaintiffs-Appellants,**

v.

**Richard G. SPADEMAN, Defendant-Appellee.**

No. 84–1634.

United States Court of Appeals, Fifth Circuit.

Oct. 7, 1985.

Wendell Coffee, Walker Metcalf, Lubbock, Tex., for plaintiffs-appellants.

Townsend & Townsend, J. George Seka, San Francisco, Cal., for defendant-appellee.

Before CLARK, Chief Judge, RANDALL and JOLLY, Circuit Judges.

RANDALL, Circuit Judge:

In this diversity case filed in a Texas district court, the plaintiffs, residents of Texas, seek to recover damages for breach of contract from a nonresident. The defendant filed a Rule 12(b)(2) motion to dismiss challenging the court's in personam jurisdiction. After a hearing on the motion, the district court dismissed the suit for want of personal jurisdiction over the defendant. The question presented is whether the defendant had sufficient contacts with Texas to support an exercise of personal jurisdiction over him. Because we agree with the district court's determination that such contacts were insufficient, the dismissal is affirmed.

## I.

The defendant, Richard G. Spademan ("Spademan"), currently a Nevada resident, is the president of Spademan Release Systems, Inc. ("SRS"), a California corporation engaged in the design, manufacture, and distribution of ski bindings. In the fall of 1974, the plaintiffs, David H. Stuart and Richard A. Whitaker (the "plaintiffs"), residents of Texas, determined that the Spademan release binding, which was then being manufactured by SRS, could be modified to make it easier to fasten and release.[1]

---

1. The plaintiffs represented themselves to be joint inventors of the modification to the Spademan ski binding. As such they applied for and obtained a patent from the U.S. Patent and Trademark Office. During proceedings regarding reissuance of the patent, it came to light that Stuart alone had modified a Spademan binding he received from Whitaker. The plaintiffs and Spademan later filed conversion papers with the patent office to delete in the original filings the listing of Whitaker as an inventor.

Whitaker was a principal in the Chalet Ski Shop, Inc., a Texas corporation located in Amarillo, which stocked the Spademan bindings for sale. The plaintiffs tested the modified bindings in November 1974 while skiing in Colorado.

On January 28, 1975, Whitaker wrote to Spademan in care of SRS, enclosing a patent search report and a working model of the modified binding, to solicit interest in the modification. Spademan returned the model unopened, explaining that SRS would not examine any suggestion in the absence of an executed disclosure form. The plaintiffs completed the disclosure form that Spademan had enclosed with the unopened model and again mailed the model to Spademan.

In the summer of 1975, Spademan requested that the plaintiffs send him some modified bindings for testing. The plaintiffs offered a countersuggestion that Spademan mail some bindings to Stuart in Amarillo for modification. On November 14, 1975, Spademan shipped two bindings to Amarillo. The bindings were modified and returned to Spademan for testing in January 1976. The plaintiffs then filed an application for a United States patent on the invention, which was issued on December 20, 1977.

In April 1977, the plaintiffs met Spademan in Denver, Colorado, to explore the possibility of incorporating the modification into the bindings manufactured by SRS. In mid-1977, Spademan requested that a copy of the patent application be forwarded to him for evaluation. Later in 1977, a demonstration unit of the binding was sent to the plaintiffs in Amarillo.

After subsequent negotiations by letter and telephone, the plaintiffs assigned the patent on the invention to Spademan. The written agreement of assignment, which was executed by the plaintiffs in Texas and Spademan in California, specified that the effective date of assignment was December 1, 1977. In addition to the assignment, the agreement provided that the plaintiffs would assist in any further patent applications or for reissuance of the existing patent and that Spademan would make payments totalling $85,000 to the plaintiffs in Texas.

A problem with the payments precipitated the parties' execution of an amendment to the original agreement in February 1980. The amendment, executed by the plaintiffs in Texas and Spademan in Nevada where he had recently moved, required that Spademan make the payments called for in the original agreement directly to the plaintiffs' bank accounts in Texas. The amendment also substituted the following choice-of-law provision for that in the original agreement, which had provided that the agreement was subject to and would be construed and enforced in accordance with California law: "All of the terms of this agreement as amended shall be subject to and shall be construed and enforced according to the laws of the state in which the aggrieved party under the terms of the contract is residing at the time such breach of contract or grievance occurs." Spademan made eight annual payments to the plaintiffs' bank accounts in Amarillo, Texas, pursuant to the amended agreement.

In the meantime, Spademan, through his attorneys, sought reissuance of the U.S. patent and began gathering information for obtaining patents in several other nations. Toward this end and pursuant to the agreement, Spademan's California attorneys contacted the plaintiffs in Texas, seeking information surrounding the invention and original patent application. A significant amount of correspondence and numerous telephone calls regarding these matters were exchanged between Spademan's attorneys in California and the plaintiffs in Texas.

On August 31, 1982, the United States Patent and Trademark Office declined to reissue the patent—a decision that Spademan has apparently appealed. Spademan's attorney wrote the plaintiffs on November 5, 1982, indicating that Spademan intended to discontinue payments under the agreement due to the failure of consideration. Spademan did not make the December 1, 1982 payment or any subsequent payment.

Electing to declare the entire indebtedness mature, as permitted under the agree-

ment, the plaintiffs filed this breach-of-contract action in the United States District Court for the Northern District of Texas. The plaintiffs effected service of process on Spademan in Nevada under Federal Rule of Civil Procedure 4(c)(2)(B). Spademan moved to dismiss the complaint for lack of personal jurisdiction and filed two affidavits and documentary evidence in support of this motion. The plaintiffs opposed the motion with affidavits, documentary evidence, and the plaintiffs' oral testimony adduced at a June 19, 1984 hearing on the motion before the district court. Based on this record evidence, the court granted Spademan's motion to dismiss for lack of personal jurisdiction, and it filed findings of fact and conclusions of law supporting the decision. The plaintiffs appeal.

On appeal, the plaintiffs allege three grounds of error: (1) the district court erred by not considering the choice-of-law provision set out in the amended agreement in determining whether personal jurisdiction could be exercised over Spademan; (2) the court erred by holding that SRS's contacts with Texas were not attributable to Spademan; (3) the court erred in its minimum-contacts analysis by assigning little or no weight to certain alleged contacts between Spademan and Texas, including the delivery of payments under the agreement, the shipment of two bindings to Texas for modification, and communications between Spademan or his attorneys and the plaintiffs concerning the patent. We address each of these contentions against the well-established framework for assessing whether an exercise of long-arm jurisdiction would offend traditional notions of fair play and substantial justice embodied in the due process clause of the fourteenth amendment.

## II.

### A. *Principles of Personal Jurisdiction*

■■■ In a diversity action, personal jurisdiction may be exercised over a nonresident defendant if: (1) the nonresident defendant is amenable to service of process under the law of the forum state; and (2) the exercise of jurisdiction under state law comports with the due process clause of the fourteenth amendment. *See Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1166 (5th Cir.1985); *D.J. Investments, Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 545 (5th Cir.1985); *Smith v. DeWalt Products Corp.*, 743 F.2d 277, 278 (5th Cir.1984). The first step of the dual inquiry is solely a matter of determining the reach of the forum state's long-arm statute. The second step—the due process inquiry—is governed by federal law and requires the satisfaction of two elements: (a) the nonresident must have some minimum contact with the forum which results from an affirmative act on his part; (b) it must be fair and reasonable to require the nonresident to defend the suit in the forum state. *See D.J. Investments*, 754 F.2d at 545; *Pedelahore v. Astropark, Inc.*, 745 F.2d 346, 348 (5th Cir. 1984); *Product Promotions, Inc. v. Cousteau*, 495 F.2d 483, 494 (5th Cir.1974). Because the Texas long-arm statute, Tex.Rev. Civ.Stat.Ann. art. 2031b (Vernon 1964 & Supp.1985), has been interpreted to extend to the limits of due process, *see Hall v. Helicopteros Nacionales de Colombia*, 638 S.W.2d 870, 872 (Tex.1982), *rev'd on other grounds*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *D.J. Investments*, 754 F.2d at 546; *Jim Fox Enterprises Inc. v. Air France*, 705 F.2d 738, 740 (5th Cir. 1983), we need only inquire whether the assertion of jurisdiction over Spademan by a district court sitting in Texas would be constitutionally permissible.

■■■ Due process requirements for exercising personal jurisdiction over a nonresident have been delineated in a familiar body of United States Supreme Court case law.[2] A minimum-contacts analysis involves more than counting the nonresi-

---

2. *See Burger King Corp. v. Rudzewicz,* —— U.S. ——, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985);

*Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d

dent's contacts with the forum. *See Hydrokinetics, Inc. v. Alaska Mechanical, Inc.,* 700 F.2d 1026, 1028 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2180, 80 L.Ed.2d 561 (1984); Brilmayer, *How Contacts Count: Due Process Limitations on State Court Jurisdiction,* 1980 Sup.Ct.Rev. 77. We must look to see whether there has been some act by which the nonresident " 'purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of its laws.' The defendant's conduct and connection with the forum state must be such that [it] should reasonably anticipate being haled into court in the forum state." *Growden v. Ed Bowlin & Associates, Inc.,* 733 F.2d 1149, 1151 (5th Cir.1984) (quoting *Hanson v. Denckla,* 357 U.S. at 253, 78 S.Ct. at 1240); *see World-Wide Volkswagen,* 444 U.S. at 294, 100 S.Ct. at 565–66; *Patterson v. Dietze, Inc.,* 764 F.2d 1145, 1147 (5th Cir.1985). The unilateral activity of those who claim some relationship with a nonresident defendant, however, cannot satisfy the requirement of contact with the forum state. *See Helicopteros Nacionales,* 104 S.Ct. at 1873; *Hanson v. Denckla,* 357 U.S. at 253, 78 S.Ct. at 1239–40; *Thomas v. Kadish,* 748 F.2d 276, 282 (5th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985); *see also* Lilly, *Jurisdiction Over Domestic and Alien Defendants,* 69 Va.L.Rev. 85, 99 (1983). A nonresident may permissibly structure his primary conduct so as to avoid being haled into court in a particular state. *See World-Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567. The Supreme Court has most recently observed:

404 (1984); *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Kulko v. Superior Court of Calif.,* 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978); *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *McGee v. International Life Ins. Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful "contacts, ties, or relations." ... By requiring that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign," ... the Due Process Clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit[.]"

*Burger King,* 105 S.Ct. at 2181–82 (citations and footnotes omitted).

 When a controversy is related to or arises out of a nonresident's contacts with the forum, the minimum-contacts inquiry focuses on the relationship among the defendant, the forum, and the litigation.[3] *See Helicopteros Nacionales,* 104 S.Ct. at 1872; *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 2580, 53 L.Ed.2d 683 (1977).

Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum ... and the litigation results from alleged injuries that "arise out of or relate to" those activities[.]

*Burger King,* 105 S.Ct. at 2182 (citations and footnotes omitted).[4] Even when a controversy does not arise out of or relate to the nonresident's contacts with the forum,

**3.** This exercise of personal jurisdiction has been termed "specific" or "limited." *See* von Mehren & Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis,* 79 Harv.L.Rev. 1121, 1144–64 (1966).

**4.** The rationale for why a forum may legitimately exercise personal jurisdiction over a nonresident who purposefully directs his activities toward forum residents was succinctly stated by Justice Brennan in *Burger King. See* 105 S.Ct. at 2182–83.

the assertion of personal jurisdiction over the nonresident does not offend due process if the contacts are sufficiently systematic and continuous as to support a reasonable exercise of jurisdiction.[5] *See Keeton v. Hustler Magazine, Inc.*, 104 S.Ct. at 1480–81; *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed.2d 485 (1952).

"[T]he constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State." *Burger King*, 105 S.Ct. at 2183. The due-process test of foreseeability is whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 567. Reasonable anticipation of out-of-state litigation is delimited by the "purposeful availment" requirement set out in *Hanson v. Denckla. See* 357 U.S. at 253, 78 S.Ct. at 1239–1240. This requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts ... or of the 'unilateral activity of another party or a third person'.... Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State." *Burger King*, 105 S.Ct. at 2183–84 (emphasis in original; citations and footnotes omitted); *see also Patterson*, 764 F.2d at 1147. For example, "with respect to interstate contractual obligations, [the Court has] emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulations and sanctions for the consequences of their activities." *Burger King*, 105 S.Ct. at 2182 (quoting *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950)); *see also McGee v. International Life Insurance Co.*, 355 U.S. at 222–23, 78 S.Ct. at 200–01. That the defendant refrained from physically entering the forum state is not of itself sufficient to avoid jurisdiction if a substantial connection otherwise exists. *See Burger King*, 105 S.Ct. at 2184.

 After deciding that a defendant purposefully established minimum contacts with the forum state, it must be determined whether maintenance of the suit comports with " 'traditional notions of fair play and substantial justice.' " *International Shoe Co.*, 326 U.S. at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)); *see Burger King*, 105 S.Ct. at 2184. The criteria of fairness require that we consider, "among other things, the interest of the state in providing a forum for the suit, the relative conveniences and inconveniences to the parties, and the basic equities." [6] *Southwest Offset, Inc. v. Hudco Publishing Co.*, 622 F.2d 149, 152 (5th Cir.1980); *see Bean Dredging Corp. v. Dredge Technology Corp.*, 744 F.2d 1081, 1085 (5th Cir.1984); *Brown v. Flowers Industries, Inc.*, 688 F.2d 328, 333 (5th Cir. 1982), *cert. denied*, 460 U.S. 1023, 103 S.Ct. 1275, 75 L.Ed.2d 496 (1983). Nevertheless, the fairness factors cannot of themselves

---

**5.** This exercise of personal jurisdiction has been termed "general." *See* Brilmayer, *supra*, at 80–81; von Mehren & Trautman, *supra*, at 1136–44.

**6.** The Court has recently indicated:

Thus courts in "appropriate case[s]" may evaluate "the burden on the defendant," "the forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several States in furthering fundamental substantive social policies." ... These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required.... Nevertheless, minimum requirements inherent in the concept of "fair play and substantial justice" may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities.... As we previously have noted, jurisdictional rules may not be employed in such a way as to make litigation "so gravely difficult and inconvenient" that a party unfairly is at a "severe disadvantage" in comparison to his opponent.

*Burger King*, 105 S.Ct. at 2185.

invest the court with jurisdiction over a nonresident when the minimum-contacts analysis weighs against the exercise of jurisdiction. *See World-Wide Volkswagen,* 444 U.S. at 294, 100 S.Ct. at 565–66; *Growden,* 733 F.2d at 1150–51.

■■■ When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident. *See Thompson,* 755 F.2d at 1165; *D.J. Investments,* 754 F.2d at 545. The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery. *See Washington v. Norton Manufacturing Co.,* 588 F.2d 441, 443 (5th Cir.), *cert. denied,* 442 U.S. 942, 99 S.Ct. 2886, 61 L.Ed.2d 313 (1979). In ruling on the motion to dismiss, the court below considered the entire record, including the affidavits and documentary evidence filed by the parties, as well as the oral testimony of the plaintiffs.

### B. *Application*

#### 1. *Minimum-Contacts Analysis*

We begin our application of the foregoing principles to the case at hand by examining the relationship among Spademan, the State of Texas, and this litigation. *See Helicopteros Nacionales,* 104 S.Ct. at 1872; *Shaffer v. Heitner,* 433 U.S. at 204, 97 S.Ct. at 2579–80. The plaintiffs argue that the district court erred in analyzing each of Spademan's contacts with Texas individually. The plaintiffs assert that the court should have looked to the totality of the circumstances, including the number of contacts, to determine whether the exercise of in personam jurisdiction is proper. They point to the following contacts: Spademan entered into a contract with Texas residents; Spademan shipped bindings to the plaintiffs in Texas for modification; Spademan, or his attorneys, and the plaintiffs exchanged letters and telephone calls regarding the assignment of the patent and the reissuance of the patent; the amended·

agreement included a choice-of-law provision that anticipated the application of Texas law; SRS advertised in and shipped its products to Texas; and, finally, SRS marketed the modified bindings in Texas.

■■■ The district court concluded that Spademan's contacts with Texas did not demonstrate that he purposefully availed himself of the privilege of conducting business in Texas or that he invoked the benefits and protection of Texas law. We agree. While the number of contacts with the forum state is not determinative, it is indeed one of the relevant factors to be considered within the totality of the circumstances in assessing the propriety of exercising personal jurisdiction over a nonresident. *See Standard Fittings Co. v. Sapag, S.A.,* 625 F.2d 630, 643 (5th Cir.1980) (identifying quantity of contacts as one of several factors used in determining whether personal jurisdiction comports with due process), *cert. denied,* 451 U.S. 910, 101 S.Ct. 1981, 68 L.Ed.2d 299 (1981); *Product Promotions,* 495 F.2d at 495 n. 17 (same); *Bigelow-Sanford, Inc. v. Gunny Corp.,* 649 F.2d 1060, 1063 (5th Cir.1981) (totality of circumstances expressly assessed in examining application of state long-arm statute); *Gold Kist Inc. v. Baskin-Robbins Ice Cream Co.,* 623 F.2d 375, 381 (5th Cir.1980) (same); *Olsen by Sheldon v. Government of Mexico,* 729 F.2d 641, 649 (9th ·Cir.) (totality of circumstances examined to determine if nonresident could reasonably anticipate defending suit in distant forum), *cert. denied,* — U.S. ——, 105 S.Ct. 295, 83 L.Ed.2d 230 (1984). We are not convinced by the plaintiffs that the district court failed to employ this criterion in analyzing Spademan's contacts with Texas. The court properly focused on the purposeful-availment inquiry—certainly itself a totality-of-the-circumstances test—while recognizing that no single factor, particularly the number of contacts, is determinative.

In *Burger King,* reaffirming its rejection of the notion that personal jurisdiction might turn on mechanical tests or conceptualistic theories of the place of contracting

or of performance, the Supreme Court noted:

> [W]e note a continued division among lower courts respecting whether and to what extent a contract can constitute a "contact" for purposes of due process analysis. If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot.... Instead, we have emphasized the need for a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." ... It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

105 S.Ct. at 2185–86 (quoting *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 316, 317, 63 S.Ct. 602, 604, 605, 87 L.Ed. 777 (1943)). The *Burger King* Court went on to hold that the nonresident-defendant franchisees had purposefully availed themselves of the benefits and protection of the law of Florida, the forum state, by entering into "a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida." *Id.* at 2186. The Court emphasized the "substantial record evidence" indicating that the franchisees knew they were affiliating themselves with a Florida-based enterprise. Hence, it was reasonable for the franchisees to be subject to the in personam jurisdiction of the district court sitting in Florida.

The record evidence in the case *sub judice* points to a contrary conclusion. We stress that Spademan's contract with the Texas plaintiffs does not alone establish the sufficient minimum contacts with Texas. Instead we look to the factors of prior negotiations, contemplated future consequences, terms of the contract, and the parties' actual course of dealing to determine whether Spademan purposefully established minimum contacts with the forum.

The district court correctly observed that Spademan's shipment of two bindings to the plaintiffs in Texas is of little weight, citing *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.*, 700 F.2d 1026, 1028 (5th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 2180, 80 L.Ed.2d 851 (1984). In *Hydrokinetics*, we held that personal jurisdiction was lacking over the defendant although: the defendant corporation had agreed to purchase specific goods to be manufactured in Texas; payment for these goods was to be made in Texas; extensive communications were exchanged between the parties (originally in Texas and Alaska) before the written agreement was signed; officers of the defendant Alaska corporation traveled to Texas to close the deal; and the contract was formally created in Texas as the place of acceptance. The court below analogized Spademan's shipment of the bindings to Texas to the officers' visit to Texas to close the deal in *Hydrokinetics*. Although this analogy is imperfect, the point is well taken, especially in the light of other of our decisions in breach-of-contract suits holding that the shipment of articles to the forum state is insufficient to justify an exercise of in personam jurisdiction over the nonresident shipper. *See, e.g., Loumar v. Smith*, 698 F.2d 759 (5th Cir.1983) (nonresident partnership not subject to personal jurisdiction of Texas court although it sold and shipped to Texas plaintiff goods that were the subject of the breach-of-contract claim). Further, we have held that an exchange of communications between a resident and a nonresident in developing a contract is insufficient of itself to be characterized as purposeful activity invoking the benefits and protection of the forum state's laws. *See Hydrokinetics*, 700 F.2d at 1029 (citing *Charia v. Cigarette Racing Team, Inc.*, 583 F.2d 184, 187–88 (5th Cir.1978); *Benja-*

*min v. Western Boat Building Corp.*, 472 F.2d 723, 729 (5th Cir.), *cert. denied*, 414 U.S. 830, 94 S.Ct. 60, 38 L.Ed.2d 64 (1973)). Thus, the communications between Spademan and the plaintiffs, whether originating in California or Texas, leading up to the agreement are insufficient to support an exercise of jurisdiction by a Texas court over Spademan. Moreover, we see little distinction between these communications and those between the plaintiffs and Spademan's attorneys regarding the reissuance of the patent. The quality of the contacts as demonstrating purposeful availment is the issue, not their number or their status as pre- or post-agreement communications. Hence, we do not even consider Spademan's dubious assertion that the communications actually involved exchanges between the plaintiffs and the U.S. Patent and Trademark Office acting through Spademan's California attorneys. The agreement to mail payment checks into the forum state does not weigh heavily in the calculus of contacts. *See Patterson*, 764 F.2d at 1147; *C & H Transportation Co. v. Jensen & Reynolds Construction Co.*, 719 F.2d 1267, 1270 (5th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1930 (1984); *Hydrokinetics*, 700 F.2d at 1029; *U-Anchor Advertising, Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex.1977), *cert. denied*, 434 U.S. 1063, 98 S.Ct. 1235, 55 L.Ed.2d 763 (1978). Hence, Spademan's mailing of payments to the plaintiffs in Texas can hardly be termed significant in terms of determining purposeful availment of the benefits of the forum state's laws. In contradistinction to the contract at issue in *Burger King*, the agreement entered into by Spademan and the plaintiffs did not contemplate a long-term relationship with the kinds of continuing obligations and wide-reaching contacts envisioned by the *Burger King* contract. Arguably, the plaintiffs' agreement to later aid in effectuating a reissuance of the original patent constitutes something of a con-

tinuing obligation. Even this contact, however, falls short of a connection giving rise to a reasonable anticipation on the part of Spademan of being haled into court in the forum state.

Considering the totality of the facts of this case, we conclude that the inference of purposeful availment necessary to support the exercise of personal jurisdiction over Spademan is not supported. The random use of interstate commerce to negotiate and close a particular contract, the isolated shipment of goods to the forum at the instigation of the resident plaintiffs, and the mailing of payments to the forum do not constitute the minimum contacts necessary to constitutionally exercise jurisdiction over Spademan. *See Patterson*, 764 F.2d at 1147; *C & H Transportation*, 719 F.2d at 1270.[7]

### 2. *Choice-of-Law Provision*

We must digress somewhat from our analysis of Spademan's purported contacts to determine if the district court properly pared from the list of consequential contacts the choice-of-law provision in the amended agreement. The choice-of-law provision specified that the agreement would be construed and enforced in accordance with the law of the state in which the "aggrieved party" is residing at the time of the breach or grievance. Neither the amendment nor the original agreement defines the term "aggrieved party." The plaintiffs argue that the choice-of-law provision was obviously drafted with litigation in mind and evinces Spademan's anticipation of possibly defending a suit in Texas courts. It can be inferred from this argument that the plaintiffs deem themselves to be the "aggrieved party" and, therefore, under the amended agreement, Texas law would be applicable. Hence, the plaintiffs conclude, the choice-of-law provision in and

---

**7.** Having held that there were insufficient contacts between Spademan and SRS to support an exercise of the district court's in personam jurisdiction, we need not consider the fairness requirement of our due process test because "the fairness prong cannot compensate for or over-

come the requirement of some minimum contacts with the forum state." *Growden v. Ed Bowlin & Assocs., Inc.*, 733 F.2d 1149, 1150–51 (5th Cir.1984) (footnote omitted); *see Patterson*, 764 F.2d at 1148 n. 5.

of itself is sufficient to show that Spademan could anticipate being haled into Texas courts thereby invoking the benefits and protection of Texas law. Spademan counters by asserting that he is the aggrieved party because the plaintiffs had previously breached their express warranty that the invention had not been sold, offered for sale, or publicly used before issuance of the patent. This alleged breach of warranty resulted in the U.S. Patent and Trademark Office's refusal to reissue the patent and, hence, a total failure of consideration supporting the assignment of the patent. It was only after these events came to pass that Spademan ceased making payments to the plaintiffs. Consequently, Spademan concludes, he is the aggrieved party and the law of Nevada, his state of residence, applies. In the context of a personal jurisdiction inquiry the significance of this conclusion, though unexplained by Spademan, is that the application of the choice-of-law provision on these facts does not yield a contact between Spademan and Texas.

■■■■■ At the outset, we note that the plaintiffs misapprehend the very nature of this contractual provision. The provision contemplates a choice of law not forum. Hence, despite plaintiffs' protestation to the contrary, the provision of itself does not evince Spademan's anticipation of being haled into a Texas court. At best, the choice-of-law provision may be said to represent yet one more of several contacts, which taken in their totality are insufficient to support personal jurisdiction. We note, however, that choice-of-law provisions warrant some weight in considering whether a defendant has purposefully invoked the benefits and protection of a state's laws for jurisdictional purposes, "[a]lthough such a provision standing alone would be insufficient to confer jurisdiction." *Burger King*, 105 S.Ct. at 2187; *see also Standard Fittings*, 625 F.2d at 642 n. 24; *Gold Kist*, 623 F.2d at 380–81. It is axiomatic that in

diversity cases, a federal court must follow the choice-of-law rules of the state in which it sits. *See Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *NCH Corp. v. Broyles*, 749 F.2d 247 (5th Cir.1985). Texas, the forum state here, has recently adopted the "most significant relationship" test of the *Restatement (Second) of Conflicts* except in "those contract cases in which the parties have agreed to a valid choice of law clause." *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984). "Thus, the Texas choice-of-law rules provide that if the parties have expressly agreed that the contract is to be governed by the law of a particular state, that intention prevails." *Budge v. Post*, 643 F.2d 372, 374 n. 1 (5th Cir.1981). Of course, the law of the chosen state must bear a reasonable relationship to the parties and the transaction, and the choice must not be the result of sham, subterfuge, or coercion. *See Dugan v. Lewis*, 79 Tex. 246, 14 S.W. 1024 (1891); *Hi Fashion Wigs Profit Sharing Trust v. Hamilton Investment Trust*, 579 S.W.2d 300, 302 (Tex.Civ. App.—Eastland 1979, no writ); Tex.Bus. & Comm.Code Ann. § 1.105(a) (Vernon 1968 & Supp.1985); *see also Teas v. Kimball*, 257 F.2d 817 (5th Cir.1958). Finding a reasonable relationship between the parties and the transaction and the state whose law has been chosen to govern a contract involves a far less rigorous standard than does the due-process inquiry for purposes of asserting personal jurisdiction over a nonresident. *See generally Woods-Tucker Leasing Corp. v. Hutcheson-Ingram Development Co.*, 642 F.2d 744 (5th Cir.1981); Pedersen & Cox, *Choice of Law and Usury Limits Under Texas Law and the National Bank Act*, 34 Sw.L.J. 755 (1980). We assume, without deciding, that Texas has a reasonable relationship to the parties and the transaction so as to constitute a valid choice.[8]

---

**8.** The domicile of a party may well provide sufficient connection with the transaction under Texas law, even in the absence of other contacts, to validate an express choice of the domicile's law. *See Southwest Park Outpatient Sur-*

*gery, Ltd. v. Chandler Leasing Division*, 572 S.W.2d 53 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ) (only apparent connection between contract and Massachusetts, the parties' express choice, was that plaintiff lender was a

Consequently, we are confronted with the parties' dispute over who really is the "aggrieved party" in this action. Because we are not properly equipped to play the role of factfinder and discern in the first instance what the parties intended by this term, for the purposes of this jurisdictional inquiry, we view the facts in the light most favorable to the party confronted by a motion to dismiss—in this case, the plaintiffs. *See D.J. Investments,* 754 F.2d at 546; *Brown,* 688 F.2d at 332. Nevertheless, even assuming that the choice-of-law provision facilitates interpretation and enforcement of the agreement in accordance with Texas law, the provision is certainly insufficient of itself to justify jurisdiction over Spademan. *See Burger King,* 105 S.Ct. at 2187. Nor is it sufficient, when added to the other alleged contacts, to alter our holding that an inference of purposeful availment is not supported by the totality of the purported contacts between Spademan and Texas. Thus, if the district court erred at all by not expressly considering the choice-of-law provision in its contacts analysis, it was harmless.[9]

3. *Attribution of Corporation's Contacts to Individual Nonresident Defendant*

Finally, the plaintiffs contend that the district court erred by failing to attribute

SRS's contacts with Texas to Spademan individually.[10] The plaintiffs argue that, throughout the course of this transaction, they considered themselves to be dealing with Spademan in his individual capacity. The record, including Spademan's grant to SRS of a nonexclusive license to the patent, supports this proposition (with which Spademan has no quarrel and which is not inconsistent with the district court's findings). Nevertheless, if we correctly understand the plaintiffs' argument, they contend that we should disregard the corporate entity of SRS and attribute SRS's contacts with Texas to Spademan individually because SRS is essentially a shell corporation whose corporate effects were used by Spademan to further his own aims. For example, the plaintiffs allege that the advertisements and information regarding the Spademan binding sent to Texas did not identify their source as a corporation and that the corporation on at least one occasion made Spademan's payment to the plaintiffs. Therefore, SRS's contacts with Texas—including its distribution of Spademan bindings and the presumed marketing of the modified bindings—should have been attributed to Spademan and considered along with the other purported contacts in the minimum-contacts analysis. We find this argument ill-founded.

Massachusetts corporation); *see also Dowling v. NADW Marketing, Inc.,* 578 S.W.2d 475, 476 (Tex.Civ.App.—Eastland 1979, writ ref'd n.r.e.) (chosen law was that of domicile of one of the contracting parties), *cited in Woods-Tucker Leasing Corp. v. Hutcheson-Ingram Dev. Co.,* 642 F.2d at 750; *Pedersen & Cox, supra,* at 767–70, esp. 767 & n. 64, 770 & n. 77.

**9.** Moreover, this particular choice-of-law provision adds little to the mix of contacts previously considered since the provision is tied to the residence of the parties—a factor already taken into account as a part of the minimum-contacts analysis.

**10.** We approach this issue with some hesitation. The court below concluded that, "[a]lthough plaintiffs have shown additional contacts with Texas on the part of Spademan Release Systems, such as advertising and soliciting sales through the agent, they have not shown that the corporation's contacts are in any way attributable to Spademan individually." This conclusion

would seem to connote that the attribution issue was before the court. Nevertheless, Spademan maintains that the attribution issue was never raised in the district court, and the plaintiffs' representations on this score at oral argument were confusing and somewhat inconsistent. Viewing the proceedings below and the plaintiffs' argument in the light most favorable to their position as the opponents to the motion to dismiss, we will assume, for the purposes of this appeal, that the plaintiffs have sufficiently raised the attribution issue.

Parenthetically, we note that, because the alleged contacts of SRS with Texas are unrelated to the underlying contractual dispute, the plaintiffs must show that SRS's contacts with Texas were continuous and systematic to support an exercise of personal jurisdiction over Spademan even if SRS's contacts with the forum state were attributed to Spademan individually. *See supra* Part II(A).

After noting that "the corporation will ordinarily insulate the individuals from the court's personal jurisdiction," some leading commentators observe that, "if the corporation is not a viable one and the individuals are in fact conducting personal activities and using the corporate form as a shield, a court may feel compelled to pierce the corporate veil and permit assertion of personal jurisdiction over the individuals." 4 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil § 1069 (Supp.1984). Thus, the fiduciary-shield doctrine—which holds that an individual's transaction of business within the state solely as a corporate officer does not create personal jurisdiction over that individual though the state has in personam jurisdiction over the corporation [11]—does not apply when courts are willing to disregard the corporate entity, usually on the theory that the individual or subsidiary is the alter ego of the corporation or parent. *See* Sponsler, *Jurisdiction Over the Corporate Agent: The Fiduciary Shield,* 35 Wash. & Lee L.Rev. 349, 359 (1978).

The obverse of the fiduciary-shield doctrine exists in cases where courts attribute to an individual the corporation's contacts with the forum state. Most of the few cases in this area are bottomed on the rationale that "individual officers, as agents of the corporation would be personally liable to any third person they injured by virtue of their tortious activity even if such acts were performed within the scope of their employment as corporate officers." *Odell v. Signer,* 169 So.2d 851, 853–54 (Fla. Ct.App.1964), *writ discharged,* 176 So.2d 94 (Fla.1965), *quoted in* Sponsler, *supra,* at 360.

While the general rule is that jurisdiction over an individual cannot be predicated upon jurisdiction over a corporation, courts have recognized an exception to this rule when the corporation is the alter ego of the individual. In these cases, courts attribute a corporation's contacts with the forum state to an individual defendant for jurisdictional purposes. *See, e.g., Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Management, Inc.,* 519 F.2d 634 (8th Cir.1975); *Bamford v. Hobbs,* 569 F.Supp. 160 (S.D.Tex.1983); *Holfield v. Power Chemical Co.,* 382 F.Supp. 388 (D.Md. 1974); *Lawson v. Baltimore Paint & Chemical Corp.,* 298 F.Supp. 373 (D.Md. 1969); *Sheard v. Superior Court,* 40 Cal. App.3d 207, 114 Cal.Rptr. 743 (1974); *Harris v. Arlen Properties, Inc.,* 256 Md. 185, 260 A.2d 22 (1969); 1 C. Swearingen, Fletcher's Cyclopedia of the Law of Private Corporations § 41.10 (1983 & Supp.1984); 4 C. Wright, A. Miller & M. Kane, *supra,* § 1069; Sponsler, *supra,* at 359–65.

The *Lakota* court considered the following factors in determining whether a corporation was the alter ego of its dominant shareholder: "[A] corporation's existence is presumed to be separate, but can be disregarded if (1) the corporation is undercapitalized, (2) without separate books, (3) its finances are not kept separate from individual finances, individual obligations are paid by the corporation, (4) the corporation is used to promote fraud or illegality, (5) corporate formalities are not followed or (6) the corporation is merely a sham." 519 F.2d at 638; *see also* 1 C. Swearingen, *supra,* § 41.10. In *Lakota,* the Eighth Circuit held that the jury's finding that the corporation was the individual's alter ego was supported by ample evidence, including evidence that the individual was the sole shareholder and sole incorporator, that he alone made loans to and borrowed from the corporation, that he and his wife owned the building housing the company and received rental payments, and that he used a corporation-purchased automobile for both business of the corporation and incidental personal business.

The *Holfield* court, upholding jurisdiction over the president-owner of a corporation, articulated the exception as follows:

**11.** Succinctly paraphrased, "jurisdiction over an individual cannot be predicated upon jurisdiction over a corporation." *Lehigh Valley Indus., Inc. v. Birenbaum,* 389 F.Supp. 798, 803–04 (S.D. N.Y.), *aff'd,* 527 F.2d 87 (2d Cir.1975). *See also Wilshire Oil Co. v. Riffe,* 409 F.2d 1277 (10th Cir.1969).

Where, as in this case, there is an unmistakable identity of interest between the defendant and the corporation through which he acts, where that corporation has acted in a manner that brings it within a long-arm statute, and where significant forum state interests are involved in the cause of action, then disregarding the corporate entity to reach the defendant for the purpose of asserting the personal jurisdiction of the state courts over the defendant does not offend the due process requirements of the Constitution.

382 F.Supp. at 394.

The aforecited cases and commentaries were developed against the backdrop of the fiduciary-shield doctrine. Without reference to the fiduciary-shield doctrine, we have had occasion to uphold jurisdiction over an individual who completely dominated a corporation. We found jurisdiction to exist essentially by attributing the defendant's contacts as a corporate representative to him individually. *See Dudley v. Smith,* 504 F.2d 979 (5th Cir.1974).

■ The narrow issue presented by the plaintiffs' attribution theory, such as it is, is whether SRS is the alter ego of Spademan so as to justify disregarding the separate corporate entity for jurisdictional purposes.[12] Given the present posture of the instant case, however, we do not even need to determine the availability of the attribution theory as a means of establishing personal jurisdiction because the plaintiffs have simply not carried their burden of showing that SRS is a facade for Spademan's interests and activities. *See Quinn v. Bowmar Publishing Co.,* 445 F.Supp.

780, 786–87 (D.Md.1978); *cf. Nelson v. International Paint Co.,* 734 F.2d 1084, 1092 (5th Cir.1984). Consequently, having construed the plaintiffs' pleadings and briefs liberally to state an attribution theory, we hold that the plaintiffs have failed to prove facts demonstrating that the corporation is but a facade for Spademan's individual activities. The plaintiffs merely contend that, throughout their course of dealing with Spademan, they considered themselves to be dealing with Spademan individually. The only facts offered by plaintiffs in support of their attribution theory are that trade magazine advertisements circulated in Texas made no reference to a corporate entity, concentrating individually on Spademan the orthopedic surgeon and developer of the advertised binding. Without citing factual support for their allegations, the plaintiffs further claim that Spademan benefited individually from SRS's contacts with Texas and that Spademan was in individual control of SRS. In summary, although items in the record evince a blurring of the distinction between Spademan's actions in his individual capacity and the actions of SRS,[13] the plaintiffs have not demonstrated that SRS is but a facade for Spademan's interests and activities to justify attributing SRS's contacts with Texas to Spademan for jurisdictional purposes.

### III.

In conclusion, we hold that there are insufficient contacts between Spademan and Texas to render constitutionally permissible an exercise of jurisdiction over Spademan by the district court sitting in

---

**12.** It should be noted that the alter ego test for attribution of contacts, i.e., personal jurisdiction, is less stringent than that for liability. *See, e.g., Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981). "Accordingly, for jurisdiction to exist, there need not be both the existence of a mere shell corporation and fraud. Rather, either factor, a shell corporation or fraud is sufficient by itself to justify jurisdiction." 3A C. Swearingen, *supra,* § 1296.1, at 81 (Supp.1984) (footnotes omitted).

**13.** For example, Spademan's letters to the plaintiffs concerning the invention and subsequent

assignment were written on SRS stationery; the plaintiffs were required to execute a disclosure form and release before SRS would examine the invention; the plaintiffs usually received payments in the form of Spademan's personal checks but once received payment by corporate check of SRS, which incidentally was drawn on insufficient funds, and, during the hearing on the motion to dismiss, Stuart responded to the court's query whether he knew that Spademan was associated with SRS: "I assumed he was the company."

Texas. We hold that, even reading the choice-of-law provision in the amended agreement to provide for Texas law to govern this transaction, this factor does not alter the minimum-contacts analysis. We further hold that the plaintiffs failed to sustain their burden of demonstrating that SRS is merely a facade for Spademan's interests and activities to justify attributing SRS's contacts with Texas to Spademan individually for purposes of establishing personal jurisdiction. For the foregoing reasons, then, the district court's dismissal of the instant action for lack of personal jurisdiction is affirmed.

AFFIRMED.

Clark, Chief Judge, filed dissenting opinion.