**Louis D. PAOLINO, Jr., Plaintiff,**

v.

**ARGYLL EQUITIES, L.L.C., et al., Defendants.**

**No. Civ.SA05CA0342XR.**

United States District Court, W.D. Texas, San Antonio Division.

Nov. 2, 2005.

Ross D. Cooper, Shulman, Rogers, Gandal, Pordy & Ecker, P.A., Rockville, MD, Jason Davis, Law Office of Jason Davis, San Antonio, TX, for Plaintiff.

J. Ken Nunley, Nunley, Davis, Jolley & Hill, L.L.P., Boerne, TX, for Defendants.

## ORDER

RODRIGUEZ, District Judge.

On this date, the Court considered Defendant Jeffrey Spanier's and Defendant Amerifund's Rule 12(b) Motion to Dismiss for Lack of Jurisdiction, Improper Venue, Insufficiency of Process and Service of Process (docket no. 11); Defendant John Franczyk's and Defendant Hussain, Egan, Bendersky & Franczyk, L.L.C.'s 12(b) Motion to Dismiss for Lack of Jurisdiction, Improper Venue, Insufficiency of Process and Service of Process (docket no. 14); Defendant Douglas McClain, Jr.'s Amended Motion to Dismiss for Lack of Jurisdiction (docket no. 55); and Defendant James Miceli's Rule 12(b) Motion to Dismiss for Lack of Jurisdiction (docket no. 53).

### I. Facts & Procedural Background

According to the Complaint, Paolino is the President, CEO, and Chairman of the Board of Mace Security International, Inc., a publicly traded company. Before the transaction giving rise to this suit, Paolino was the beneficial owner of approximately 19.7% of the issued and outstanding shares of Mace. On April 15, 2004, Paolino and his broker approached Defendant Jeffrey Spanier, the President of Amerifund. Spanier directed Paolino to Argyll Equities. Plaintiff alleges that, "[a]t all relevant times, Spanier was the intermediary through whom Paolino negotiated the loan agreement with Argyll." Further, according to Paolino's Complaint, Spanier assured Paolino that his stock would be held in escrow during the loan term so long as Paolino was not in default and that Argyll would provide Paolino with notices in advance of the date of each quarterly interest payment. Paolino alleges that this promise to provide notice of interest payments due was repeated by Argyll's then-Chief Financial Officer following execution of the loan.

On April 20, 2004, Paolino entered into a Private Collateralized Loan Agreement (with an amendment), and two related agreements (the Pledge Agreement and Nonrecourse Promissory Note) with Argyll Equities, Inc. Under these agreements, Argyll agreed to loan Paolino approximately $4.1 million in exchange for his pledge of 1.19 million shares of Mace as

collateral. The loan documents contained a forum selection clause providing that Paolino "consents to the exclusive jurisdiction of the courts sitting in Kendall County, Texas, United States of America … for the purpose of any suit, action or other proceeding by any party to this Agreement, arising out of or related in any way to this Agreement."

On July 12, 2004, Argyll provided Paolino with the amount of his first quarterly interest payment, which Paolino then timely paid. Paolino's next payment was due October 15, 2004. However, Paolino did not receive notice regarding the interest amount due. On November 22, 2004, Argyll provided Paolino with a Notice of Event of Default based on his failure to timely pay the October 15 interest payment. The notice further indicated that Argyll was terminating the loan agreement and that Argyll could seize and sell the Mace stock. Paolino responded to the notice of default, advising Argyll that he deemed the notice to be notice of the interest amount due, and tendered the interest payment. According to the Complaint, though Argyll accepted the payment, it refused to rescind the default and continued to claim an ability to dispose of the Mace stock.

In a letter dated November 5, 2004, Defendant John Franczyk of the law firm of Defendant Hussain Egan Bendersky Franczyk, L.L.C., sent a letter to Paolino offering to defer Argyll's exercise of its right to dispose of the stock on the condition that Paolino execute a modified loan agreement. Paolino alleges that, that same day, Franczyk promised by email to Paolino's counsel that Argyll would take no action with regard to the stock until at least the close of business on November 8.

Paolino alleges that Franczyk intended to induce Paolino to refrain from or to defer filing suit or notifying federal and state regulators, and to force Paolino to expend resources investigating the matter, when in fact Franczyk knew that Argyll had already disposed of the Mace stock. In reliance on the promise, Paolino did not pursue immediate action and agreed to a standstill agreement to pursue negotiations with Argyll. Negotiations were extended by agreement through December 23, 2004. Paolino alleges that Franczyk and Argyll never intended to reach an agreement but were simply trying to delay and increase Paolino's costs in the hopes that he would withdraw and not learn of the stock sale. According to Paolino, during the period of negotiation, Defendants James Miceli and Douglas McClain, Jr., both Argyll principals, also specifically represented to Paolino over the telephone that no action would be taken with regard to the stock.

On December 16, 2004, Paolino filed suit in the 216th District Court for Kendall County, Texas against Argyll, eventually amending his complaint to add the remaining Defendants. Paolino alleges that, upon learning of a similar fraudulent scheme involving a borrower in Hong Kong,[1] Paolino voluntarily dismissed the suit on April 25, 2005 and filed suit in this Court. Plaintiff brings numerous counts against Defendants, including Breach of Contract (Argyll), Unjust Enrichment (all Defendants), Civil Conspiracy (all Defendants), Fraud and Fraudulent Inducement (all Defendants), RICO/RICO conspiracy (all Defendants), DTPA (Argyll), Usury (Argyll), Accounting (Argyll), Conversion (Argyll), and violations of Texas Business and Commerce Code § 27.01 (Argyll, Spa-

---

1. Siko Ventures Limited sued Argyll Equities in the High Court of the Hong Kong Administrative Region. Siko has filed suit in this Court to enforce the judgment rendered in its favor. *See* SA–05–CA–100–OG.

nier, and Amerifund). Paolino seeks compensatory and exemplary damages. Paolino alleges federal jurisdiction based on federal question (RICO) and supplemental jurisdiction over the state-law claims. Plaintiff further alleges that venue is proper under 28 U.S.C. § 1391 because Defendant Argyll Equities has its principal place of business in Texas and, pursuant to 18 U.S.C. § 1965(b), RICO's nationwide service of process provision, the ends of justice require that the other parties be brought before this Court.

On August 30, 2005, this Court granted Argyll's motion to dismiss Plaintiff's claims against it based on the forum selection clause.

## II. Defendants Spanier and Amerifund's Rule 12(b) Motion to Dismiss (docket no. 11)

Defendant Jeffrey Spanier and Defendant Amerifund move to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction, Rule 12(b)(3) for improper venue, Rule 12(b)(4) for insufficiency of process, and Rule 12(b)(5) for insufficiency of service of process. These Defendants' primary argument is that they have insufficient contacts with Texas to support an exercise of personal jurisdiction, and Defendants' 12(b)(4) and 12(b)(5) motions are based solely on their objection to personal jurisdiction.

### A.

Defendants state that Jeffrey Spanier is the President of Amerifund, a closely held corporation, and that Amerifund acts as a "broker of sorts" by placing people who want high-end unconventional loans in touch with Argyll, which provides working capital secured by stock as collateral (called "stock loans"). According to Spanier's affidavit, Amerifund has worked with Argyll since 2003 and primarily "puts people who need high-end loans in contact

with Argyll, who in turn lends them large sums of money." He further states that Amerifund and Argyll are not business partners, nor is Spanier a business partner with Argyll. Amerifund's principal place of business is in Boca Raton, Florida, and it has no offices or employees in Texas.

Spanier was introduced to Paolino on April 15, 2004 when Paolino came to his Florida office. Spanier did not solicit business from Paolino, but was introduced to Paolino through Paolino's own Florida broker. When Paolino told Spanier what he needed, Spanier put him in contact with Argyll. Argyll is a Texas L.L.C. with its principal place of business in California. Spanier states that "[a]fter the meeting that took place with Mr. Paolino and his broker in my office, all of my communications related to Mr. Paolino's loan took place in my Florida office: either between me and Mr. Paolino at his home in Florida, or between me and one or more of Mr. Paolino's representatives in Florida or New Jersey; or between me and Argyll in California, Illinois and Georgia." Neither Amerifund nor Spanier is a party to the loan transaction, and Spanier states that he did not negotiate any part of the transaction reflected in the loan documents. Spanier asserts that, although he has made a few phone calls to Argyll at its Texas office, the transaction made the basis of this suit was done wholly with the California and Georgia Argyll offices, and no communications whatsoever went through Texas.

Defendants further assert that it would have been "impossible for Mr. Spanier or his company, Amerifund, to anticipate being haled into court in Texas. The only mention of Texas in the entire transaction was that Argyll had an office there." Defendants state that there was no labor performed, no services rendered, no communications made, and no material fur-

nished in Texas by Spanier or Amerifund. Defendants argue that, contrary to Paolino's allegations in the Complaint, Spanier had no communication with the parties to the loan documents about the terms therein; he only relayed messages from Paolino to Argyll. In his affidavit, Spanier states that, although he serves "as a conduit of information between potential borrowers and Argyll," he does not engage in any negotiations with Argyll's clients and cannot change the terms of loan documents between borrowers and Argyll. Defendants argue that the communications between Spanier and Paolino before the loan documents were signed are wholly outside Texas and Defendants Spanier and Amerifund lack minimum contacts with Texas. Defendants further argue that an exercise of jurisdiction over them by this Court would offend traditional notions of fair play and substantial justice.

Plaintiff responds that Defendants "incorrectly focus on their alleged lack of contacts with Texas to argue that they are not subject to personal jurisdiction in this Court," but fail to discuss their amenability to personal jurisdiction pursuant to RICO's nationwide service of process provision, 18 U.S.C. § 1965. Paolino argues that Argyll incorporated a forum selection clause into the loan documents requiring Paolino to litigate in Texas, and the Court should not permit one RICO conspirator to force Paolino to litigate in Texas while allowing its co-conspirators to escape the Court's jurisdiction because they allegedly lack contacts with Texas.

Paolino argues that he seeks redress for an ongoing conspiracy among Argyll, Spanier, Amerifund, and others to defraud individuals out of their stock holdings, and that Defendants' conduct falls squarely within the RICO statute. RICO authorizes nationwide service of process, and under Fifth Circuit precedent, the relevant inquiry is whether the defendant has had minimum contacts with the United States. Further, Plaintiff argues, courts in the Fifth Circuit have held that RICO's nationwide service of process provision is satisfied if at least one defendant is subject to jurisdiction in the forum because that defendant resides, is found, has an agent, or transacts his affairs there and no other forum exists that would have jurisdiction over all the defendants. Paolino Response (docket no. 28) at 5 (citing *Dale v. Ala Acquisitions, Inc.*, 203 F.Supp.2d 694, 699 (S.D.Miss.2002); *Johnson v. Investacorp., Inc.*, 1990 WL 25034 *2 (N.D.Tex.1990)). Accordingly, Paolino argues, because Argyll is a Texas company with an office in Texas and it conducts business in Texas, and because it is undisputed that Spanier and Amerifund have contacts with the United States, they are subject to this Court's jurisdiction.

Alternatively, Paolino argues that this Court should stay a determination of the motion to dismiss to permit Paolino to conduct discovery regarding Spanier and Amerifund's contacts with Texas before responding to the motion because it raises questions regarding their amenability to personal jurisdiction under the long-arm statute. Paolino contends that he should be permitted to elicit discovery from Spanier and Amerifund regarding their contacts with Texas that are not addressed by Spanier's affidavit. Thus, should the Court find that RICO's nationwide service of process provision does not confer personal jurisdiction, Paolino requests that the Court stay the motion to dismiss to allow Paolino to take discovery aimed at the jurisdictional issue.

Defendants respond that this case is not properly brought under RICO and that it is barred by the Private Securities Litigation Reform Act of 1995, which prohibits RICO claims based on conduct that would

be actionable as securities fraud. Defendants further argue that Paolino has failed to state a RICO enterprise connected with a continuing pattern of racketeering activity, and that Paolino's reliance on nationwide service of process is misplaced. Further, Defendants argue that Paolino has not shown that he is entitled to discovery, as he has not submitted any affidavits to contradict Defendants' affidavits, there is no issue of material fact concerning jurisdiction and additional discovery would not raise one, and Paolino should not be permitted to engage in a fishing expedition.

### B.

RICO provides:

(a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

(b) In any action under section 1964 [civil remedies for RICO violations] of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

. . . . .

(d) All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is

found, has an agent, or transacts his affairs.

18 U.S.C. § 1965.

The general venue statute, 18 U.S.C. § 1391, does not support Plaintiff's choice of venue here. However, Plaintiff brought suit in this district pursuant to section 1965(a), RICO's venue provision. Section 1965(a) allows a plaintiff to institute a RICO action in any judicial district in which any defendant resides, has an agent, is found, or transacts his affairs. Once venue and personal jurisdiction are proper as to one defendant under section 1965(a), RICO provides for nationwide service of process over other defendants residing outside that district pursuant to section 1965(b).[2] Because RICO authorizes nationwide service of process, a federal court may assert personal jurisdiction over a defendant based on the defendant's contacts with the United States as a whole if the exercise of jurisdiction comports with due process. *See Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir.1994) ("When a federal court is attempting to exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States.").

As Plaintiff recognizes, the purpose of section 1965(b) is to allow a plaintiff to bring all defendants before the Court in a single trial. Paolino's Response at 7; *Butcher's Union Local No. 498 v. SDC Investment, Inc.*, 788 F.2d 535, 539 (9th Cir.1986); *Andrade v. Chojnacki*, 934 F.Supp. 817, 831 (S.D.Tex.1996). A pre-

---

**2.** *But see Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir.1997) (stating without analysis that section 1965(d) provides for nationwide service of process); *see also PT United Can Co.*

*Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 70 (2d Cir.1998) (recognizing that "there is now an apparent conflict in circuits on this issue").

requisite to causing a party to be summoned before the Court under section 1965(b) is the presence of at least one other defendant who is properly before the Court under section 1965(a). *Anchor Glass Container Corp. v. Stand Energy Corp.*, 711 F.Supp. 325, 331 (S.D.Miss. 1989). Plaintiff argues that this Court has personal jurisdiction over Argyll and that the "ends of justice" require that Spanier and Amerifund be subject to jurisdiction here. However, Argyll cannot be sued in this Court because of the forum selection clause, and Plaintiff's claims against Argyll have been dismissed. Without Argyll, the purpose of section 1965(b) is frustrated and the "ends of justice" do not require this Court to exercise jurisdiction over Spanier and Amerifund under section 1965(b). Thus, the Court must analyze whether Spanier and Amerifund are subject to personal jurisdiction in this Court under the Texas long-arm statute.

## C.

The party invoking the jurisdiction of the federal court bears the burden of establishing minimum contacts justifying the court's jurisdiction over a nonresident defendant. *Guidry v. United States Tobacco Co.*, 188 F.3d 619, 625 (5th Cir.1999). When a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, the nonmovant need only make a prima facie showing of jurisdiction, and the court must accept as true the nonmovant's uncontroverted allegations and resolve all factual disputes in its favor. *Id.* If there are conflicts between some of the facts alleged by the Plaintiffs and those alleged by the Defendants in their affidavits, such conflicts must be resolved in the Plaintiffs' favor for the purposes of determining whether a prima facie case has been established. *Id.* at 626. In resolving a jurisdictional issue, the court may review

pleadings, affidavits, interrogatories, depositions, oral testimony, exhibits, any part of the record, and any combination thereof. *Command–Aire Corp. v. Ontario Mech. Sales & Serv., Inc.*, 963 F.2d 90, 95 (5th Cir.1992). The prima-facie-case requirement does not require the court to credit conclusory allegations, even if uncontroverted. *Panda Brandywine Corp. v. Potomac Elec. Power*, 253 F.3d 865, 868 (5th Cir.2001)

A federal district court in a particular state may exercise personal jurisdiction over a defendant under that state's long-arm statute. *Submersible Sys., Inc. v. Perforadora Central, S.A.*, 249 F.3d 413, 418 (5th Cir.2001). If the state long-arm statute allows the district court to exercise personal jurisdiction, the exercise of personal jurisdiction must also be proper under the Due Process Clause of the Fourteenth Amendment. *Id.* Texas courts have construed the Texas long-arm statute to extend to the limits of the Due Process Clause of the Fourteenth Amendment. *Bullion v. Gillespie*, 895 F.2d 213, 216 (5th Cir.1990).

Specific jurisdiction is appropriate when a defendant has purposefully directed his activities at the forum state and the "litigation results from alleged injuries that 'arise out of or relate to' those activities." *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). Even when specific jurisdiction is lacking, the court may exercise "general personal jurisdiction," which is personal jurisdiction based on a defendant's contacts with the forum that are generally unrelated to the controversy. *Helicopteros*, 466 U.S. at 414, 104 S.Ct. 1868. To exercise general jurisdiction, the court must determine that "the contacts are suf-

ficiently systematic and continuous as to support a reasonable exercise of jurisdiction." *Stuart v. Spademan,* 772 F.2d 1185, 1191 (5th Cir.1985) (citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). General jurisdiction is assessed by evaluating the defendant's contacts with the forum, in toto, over a reasonable number of years, up to the date the suit was filed. *Access Telecom, Inc. v. MCI Telecomms. Corp.,* 197 F.3d 694, 717 (5th Cir.1999). The continuous and systematic contacts test for general jurisdiction "is a difficult one to meet, requiring extensive contacts between a defendant and a forum." *Submersible Sys.,* 249 F.3d at 419; *see also Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex. 1990) ("The minimum contacts inquiry is broader and more demanding when general jurisdiction is alleged, requiring a showing of substantial activities in the forum state.").

Although Plaintiff alleges that the Defendants engaged in a conspiracy, the Court must evaluate each Defendant's contacts separately to determine whether personal jurisdiction exists. *Nat'l Industrial Sand Ass'n v. Gibson,* 897 S.W.2d 769, 773 (Tex.1995) (when a foreign defendant is alleged to have engaged in a conspiracy with a resident, the court will not exercise jurisdiction over the foreign defendant based solely upon the effects or consequences of an alleged conspiracy; rather, the inquiry remains on whether the defendant individually, and not as part of the conspiracy, purposefully established minimum contacts that would satisfy due process); *see also Guidry,* 188 F.3d at 625.

Even when a defendant has minimum contacts with the forum state, an exercise of personal jurisdiction must also be reasonable in light of the forum's interest in the litigation in question. *Submersible Sys.,* 249 F.3d at 418 (citing *Asahi Metal*

*Indus. Co., Ltd. v. Superior Court of Calif.,* 480 U.S. 102, 113–14, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)). The court must determine whether maintaining the suit offends traditional notions of fair play and substantial justice. *See Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

### D.

■ The crux of Paolino's allegations against Spanier and Amerifund are that, as part of the conspiracy to defraud Paolino, Spanier directed Paolino to Argyll for the loan transaction, assured Paolino that his stock would be held in escrow during the loan term so long as Paolino was not in default, and assured Paolino that Argyll would provide Paolino with notices in advance of the date of each quarterly interest payment.

If viewed as contract negotiations, the law is clear that an exchange of communications between a resident and a nonresident in developing a contract is insufficient of itself to be characterized as purposeful activity invoking the benefits and protection of the forum state's laws. *Stuart v. Spademan,* 772 F.2d 1185, 1193 (5th Cir. 1985). In this case, Plaintiff, Spanier, and Amerifund are Florida residents, and thus it seems clear that the contract negotiations between Spanier and Plaintiff, assuming they can be characterized as negotiations (Spanier states in his affidavit that he does not engage in any negotiations with Argyll clients, but the Court must accept controverted facts in Plaintiff's favor), would be insufficient in and of themselves to confer jurisdiction. Even if Spanier were acting as Argyll's agent, the contacts would be insufficient—though the contract includes a Texas choice-of-law forum, Spanier is not a party to the contract, and thus only Argyll, not Spanier, could be characterized as having invoked the bene-

fits and protections of Texas law. More-over, though choice-of-law provisions carry some weight in determining purposeful availment of the benefits and protection of a state's laws for jurisdictional purposes, such a provision standing alone is insufficient to confer jurisdiction. *Id.* at 1195. Here, we have a Florida resident communicating with another Florida resident and with lawyers and other persons outside Texas about a contract to be entered with Argyll, which is organized under Texas law but is headquartered in California. Spanier had no contacts with the Texas office during the contract development or execution, and was not paid from the Texas office. No significant part of the contract was to be performed in Texas,[3] and certainly it made no difference to Spanier or Amerifund that Argyll was organized under Texas law or that it had an office in Texas.

■■■ Viewing the contacts under the tort lens rather than contract, the Court still finds that Spanier and Amerifund do not have minimum contacts with Texas. "When a nonresident defendant commits ... an act outside the state that causes tortious injury within the state, that tortious conduct amounts to sufficient mini-mum contacts with the state by the defendant to constitutionally permit courts within that state, including federal courts, to exercise personal adjudicative jurisdiction over the tortfeasor and the causes of action arising from its offenses or quasi-offenses." *Guidry v. United States Tobacco Co., Inc.,* 188 F.3d 619, 628 (5th Cir. 1999). "Even an act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct." *Id.* In this case, Paolino has not shown that Spanier or Amerifund foresaw or intended any consequences in Texas. Nor has he shown that Spanier or Amerifund engaged in any tortious act within Texas. Plaintiff asserts tort claims against Spanier and Amerifund for unjust enrichment, civil conspiracy, fraud and fraudulent inducement, and violations of the Texas Business and Commerce Code section 27.01, but Plaintiff has not shown or even alleged that any part of these torts was committed by Spanier or Amerifund in Texas.[4] Accordingly, Paolino's al-

---

**3.** The only real "performance" involved in this stock loan contract was payment, and payment being sent into the forum is generally insufficient to confer jurisdiction. *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.,* 700 F.2d 1026, 1029 (5th Cir.1983). In any event, it appears that Paolino made his payments to Argyll's La Jolla, California office, not the Boerne, Texas office. *See* Complaint exhibit E (Nov. 3, 2004 letter from Paolino to Cassie Fowler). Other than the forum selection clause, the only connection this contract appears to have had with Texas is that Argyll held the stock in the Dallas office of First London Securities, and the ultimate sale of the stock occurred via that Dallas company.

**4.** The tort of conversion is completed at the time and place the property is converted. *Cf. Cycles, Ltd. v. W.J. Digby, Inc.,* 889 F.2d 612,

619 (5th Cir.1989) (noting that the tort of conversion is complete when the defendant takes, detains, or disposes of chattel and thus injury is suffered at the time and place the property is converted, whereas damages are the harms sustained as a result of the legal injury); *see also Allred v. Moore & Peterson,* 117 F.3d 278, 282 (5th Cir.1997). Paolino's Mace stock was held by First London Securities in Dallas, and someone at Argyll called the owner of First London Securities with the instruction to sell the stock. McClain Depo at 80–81. Although Plaintiff asserted a cause of action for conversion against Argyll, and based on McClain's deposition testimony it appears that the stock was held and sold through a Dallas company, Plaintiff has not sued Spanier or Amerifund or any other Defendant for conversion, and the conversion claim against Argyll has been dismissed.

legations fail to support specific jurisdiction.

In addition, there is no indication that Spanier or Amerifund have the type of contacts necessary to support general personal jurisdiction. *See Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 407, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (finding no general jurisdiction despite Helicol's ongoing business relationship with three joint venturers over seven years); *Central Freight Lines, Inc. v. APA Transport Corp.,* 322 F.3d 376 (5th Cir. 2003) (concluding that defendant's contacts with Texas in routinely arranging and receiving interline shipments to and from Texas and sending sales people to Texas on a regular basis to develop business, negotiate contracts, and service national accounts, while in some sense "continuous and systematic," were not substantial enough to justify personal jurisdiction); *Wilson v. Belin,* 20 F.3d 644, 649–50 (5th Cir.1994) (court lacked personal jurisdiction over defendant despite the fact that defendant had a relationship with a Texas law firm and engaged in various professional and pro bono projects in the state over a period of several years).

▉ Though Plaintiff requests a stay to allow him to conduct additional discovery including: how many clients Spanier has referred to Argyll, the nature of the agreement between Argyll and Amerifund, what other business Amerifund has conducted with Argyll in Texas, to what other entities in Texas Amerifund refers clients, Amerifund's knowledge of or participation in the drafting of the Texas forum selection/choice of law provision in the Argyll/Paolino loan transaction, and the extent of the interactivity Amerifund has had with Texas citizens through its website,

the Court finds that a stay is not warranted.

▉ A district court has "broad discretion in all discovery matters," and "such discretion will not be disturbed ordinarily unless there are unusual circumstances showing a clear abuse." *Kelly v. Syria Shell Petroleum Dev.,* 213 F.3d 841, 855 (5th Cir.2000). Discovery on matters of personal jurisdiction need not be permitted unless the motion to dismiss raises issues of fact. *Wyatt v. Kaplan,* 686 F.2d 276, 283 (5th Cir.1982). When the lack of personal jurisdiction is clear, discovery would serve no purpose and should not be permitted. *Id.* Accordingly, discovery may be denied on questions of personal jurisdiction when the discovery sought "could not [add] any significant facts." *Id.*

It is clear from Spanier's affidavit that the discovery sought would not demonstrate sufficient minimum contacts to support jurisdiction. For example, Plaintiff seeks discovery on issues such as how many clients Spanier has referred to Argyll and what other business Amerifund has conducted with Argyll in Texas. But Spanier's affidavit, which states that (1) almost all of his dealings with Argyll are with their offices in La Jolla, California and Savannah, Georgia, (2) he has had only a few occasions to call Argyll's Boerne, Texas office, (3) he has never traveled to Texas, and (4) he has never mailed anything or directed any written communications to Texas, demonstrates that any such contacts would be insufficient to support jurisdiction. Even if Spanier and Amerifund referred numerous clients to Argyll, those contacts would at most constitute doing business with the forum, not doing business in the forum.[5] In addition, Spani-

---

5. The Court notes that, based on Spanier's affidavit, even if Spanier did refer numerous clients to Argyll, Spanier dealt primarily with

the La Jolla Argyll office rather than the Texas office, and thus such referrals would have almost nothing to do with Texas other than

er's affidavit also demonstrates that discovery concerning other entities in Texas to which Amerifund refers clients and how many of Amerifund's clients have been Texas citizens would not yield sufficient contacts for general jurisdictional purposes. Moreover, even if Spanier or Amerifund were aware of or participated in the drafting of the Texas forum selection/choice-of-law provision in the Argyll/Paolino loan transaction, that conduct would be insufficient to confer jurisdiction.

With regard to Amerifund's website, courts addressing the issue of whether personal jurisdiction can be constitutionally exercised over a defendant look to the "nature and quality of commercial activity that an entity conducts over the Internet." *Mink v. AAAA Development LLC*, 190 F.3d 333, 336 (5th Cir.1999) (*citing Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1124 (W.D.Pa.1997)). Internet use is categorized into a spectrum of three areas. At one end of the spectrum, there are situations in which a defendant clearly does business over the Internet by entering into contracts with residents of other states that "involve the knowing and repeated transmission of computer files over the Internet." *Zippo*, 952 F.Supp. at 1124. In that situation, personal jurisdiction is proper. *See id.* At the other end of the spectrum, there are situations in which a defendant merely establishes a passive website that does nothing more than advertise on the Internet. With passive websites, personal jurisdiction is not appropriate. *See id.* In the middle of the spectrum, there are situations in which a defendant has a website that allows a user to exchange information with a host computer. In this middle ground, "the exercise of jurisdiction is determined by the level of interactivity and commercial nature of the exchange of information that occurs on the Website." *Id.*

Because Paolino's claims did not arise in any way from Amerifund's internet activities, the website is only relevant to a general jurisdiction inquiry. The Fifth Circuit has noted that the sliding scale is not well adapted to the general jurisdiction inquiry, because even repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous, and systematic contacts required for a finding of general jurisdiction—in other words, while a business with a website may be doing business with Texas, it is not doing business in Texas. *Revell v. Lidov*, 317 F.3d 467, 471 (5th Cir.2002) (citing *Access Telecom, Inc. v. MCI Telecomm. Corp.*, 197 F.3d 694, 717 (5th Cir.1999) and *Bancroft & Masters. Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir.2000) ("[E]ngaging in commerce with residents of the forum state is not in and of itself the kind of activity that approximates physical presence within the state's borders.")). Noting this, some district courts have held that, for the purpose of conducting a general jurisdiction analysis, it is not enough to find that an interactive website has the potential to reach a significant percentage of the forum state's population. *See J–L Chieftan, Inc. v. W. Skyways, Inc.*, 351 F.Supp.2d 587, 594 (E.D.Tex.2004) (citing *Origin Instruments Corp. v. Adaptive Computer Systems, Inc.*, 1999 WL 76794 at *4 (N.D.Tex. Feb.3, 1999)). Instead, for the contact to be continuous and systematic, there must be proof that the website is actually reaching a portion of the state's

---

the fact that Argyll is organized under Texas law and maintains an administrative office in Texas. The fact that Argyll is organized under Texas law and maintains a Texas office are not purposeful contacts by Spanier and Amerifund, and thus are insufficient to confer personal jurisdiction over them.

population. *J–L Chieftan*, 351 F.Supp.2d at 587.

The Court has visited *www.stocklending.com*, Amerifund's website. The site primarily provides information about the types of services offered. Though Paolino asserts that the website "includes at least an electronically submitted application form," the form is not an application form. Rather, the form is available through the "contact" link and allows a user to input their contact information and specific information about the stock that he would use as collateral for a loan. There is no indication that the form is any kind of actual loan application, nor is it likely that it is a loan application, given that Amerifund brokers loans rather than entering into loan contracts itself. The website is thus only minimally interactive, and no contracts are made or products sold through the website. The website does not target Texas residents. Accordingly, the Court finds that the website is insufficient to establish general jurisdiction. *See Bellorin v. Bridgestone/Firestone, Inc.*, 236 F.Supp.2d 670, 682–83 (W.D.Tex.2001). Accordingly, Plaintiff's request for additional discovery is denied because it would not add any significant facts.

### E.

In sum, Defendants Jeffrey Spanier and Amerifund do not have minimum contacts sufficient to confer either specific or general personal jurisdiction. Plaintiff's motion for a stay of proceedings to permit jurisdictional discovery is DENIED. Defendants' motion to dismiss for lack of personal jurisdiction is GRANTED.

### III. Attorney Defendants' Rule 12(b) Motion to Dismiss (docket no. 14)

Defendant John Franczyk and Defendant Hussain, Egan, Bendersky, and Franczyk, LLC, move to dismiss pursuant to Rule 12(b)(2) to lack of personal jurisdiction, Rule 12(b)(3) for improper venue, Rule 12(b)(4) for insufficiency of process, and Rule 12(b)(5) for insufficiency of service of process. These Defendants' primary argument is that they have insufficient contacts with Texas to support an exercise of personal jurisdiction. Defendants' 12(b)(4) and 12(b)(5) motions are based solely on their objection to personal jurisdiction.

Plaintiff alleges that, after the alleged default, Argyll's general counsel, John Franczyk of the law firm Hussain Egan Bendersky & Franczyk, LLC, sent him a letter dated November 5, 2004, offering to "defer [Argyll's] exercise of" its right to dispose of the stock on the condition that, among other things, Paolino execute a modified loan agreement. Plaintiff further alleges that, on the same day, Franczyk promised on behalf of Argyll that Argyll would "take no actions with respect to the MACE stock" that Louis Paolino pledged as collateral for his loan from Argyll at least until close of business on Monday, November 8. On information and belief, Plaintiff alleges that Franczyk knew this to be false and knew that Argyll had already disposed of the stock. On November 8, Franczyk and Paolino extended the standstill agreement until November 22 so that the parties could continue to negotiate a modified loan agreement. On November 19, they agreed to further extend the negotiation period until December 23. On information and belief, Plaintiff alleges that neither Franczyk nor his clients intended to reach an agreement with Paolino, but were simply trying to delay and increase Paolino's costs in the hope that he would withdraw and never learn that Argyll had sold the stock in breach of the agreement.

The attorney defendants argue that this Court cannot exercise either general or

specific jurisdiction over them because they lack minimum contacts with Texas and an exercise of jurisdiction would offend traditional notions of fair play and substantial justice. Defendant John Franczyk is an attorney who lives and practices in Illinois. Defendant Hussain Egan Bendersky & Franczyk, LLC is a law firm located in Illinois. Franczyk's affidavit states that he has represented Argyll since its formation in 2002. Before the summer of 2003, Argyll's primary administrative offices were located in Illinois. Although Argyll is a Texas LLC, its principal offices are located in La Jolla, California, and its principals live outside of Texas. Franczyk states that he had no involvement in establishing Argyll and has no other clients in Texas.

These defendants assert that they were not involved in the initial negotiations of the loan transaction, and only Defendant John Franczyk participated, as an attorney for Argyll, in settlement negotiations after Paolino allegedly defaulted. Accordingly, the only two relevant contacts with Texas—Franczyk's visits to Argyll's litigation counsel—occurred after Paolino had sued Argyll in Texas.

The attorney defendants argue that it would have been impossible for them to anticipate being haled into court in Texas. For support, they assert that "[t]he only mention of Texas in the entire loan transaction was that Argyll had an office there." Further, they argue that "the decisive weight of authority holds that an attorney practicing in Texas for the limited purpose of a lawsuit will not be subjected to personal jurisdiction." Other than the two trips to Texas after suit was filed, every single act by Franczyk that Paolino complains of occurred outside of Texas. Defendants argue that nothing Paolino complains of happened in Texas, and even if torts were committed, they were commit-ted outside the state. All representations made the basis of Paolino's suit were made by Franczyk in Illinois to Paolino's attorneys in Maryland.

In response, Plaintiff again argues that the proper focus is not on Texas's long-arm statute, but on RICO's nationwide service of process provision. In the alternative, Plaintiff seeks a stay to permit jurisdictional discovery concerning the attorney defendants' Texas contacts.

■ The Court concludes that Defendants Franczyk and Hussain Egan lack minimum contacts with Texas sufficient for the Court to exercise personal jurisdiction. Plaintiff's allegations do not support specific jurisdiction because any false representations by Franczyk were not directed to or from Texas. Franczyk states that, before he was sued, he dealt solely with Argyll in California and with Paolino's attorneys in Maryland. Plaintiff has not even alleged that any part of a tort cause of action alleged against Franczyk was committed in Texas. In addition, Franczyk's relationship with Argyll as its general counsel is insufficient to establish general personal jurisdiction. Though Argyll is organized under Texas law, its headquarters were located in Illinois and now in California, and none of its principals are here. Franczyk has no other clients in Texas and has traveled here only for vacation and for consultations with Argyll's counsel since the suit was filed. These contacts are insufficient for general jurisdiction. Because Plaintiff's request for additional discovery would not add significant facts, the request for a stay to conduct jurisdictional discovery (docket no. 29) is DENIED. Defendant John Franczyk and Defendant Hussain, Egan, Bendersky, and Franczyk, LLC, motion to dismiss for lack of personal jurisdiction (docket no. 14) is GRANTED.

## IV. Defendant McClain's Amended Rule 12(b) Motion to Dismiss (docket no. 55)

Defendant Douglas McClain, Jr., moves to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction. McClain, the President of Argyll, was personally involved in the contract negotiations in April 2004. Plaintiff alleges that, after the alleged default, and during the time when the parties were attempting to negotiate a modified loan agreement, McClain specifically represented to Paolino in principal-to-principal conversations that no action would be taken with regard to the stock. McClain argues that these contacts are insufficient to support specific personal jurisdiction. In addition, McClain argues that, though he has some contacts with Texas, they are not "continuous and systematic" sufficient to confer general personal jurisdiction. Paolino argues that McClain has sufficient contacts for this Court to exercise personal jurisdiction. The Court allowed Plaintiff to depose McClain regarding his contacts with Texas.

### A.

McClain lives and works in Georgia. However, Plaintiff asserts that McClain has substantial, continuous, and regular contact with Texas because (1) he has maintained a personal stock brokerage account in Dallas, in which he trades and has traded for at least two years, (2) he travels here "regularly" each year for personal visits with his family, and sometimes he rents automobiles, (3) he maintains a Texas driver's license (despite the fact that he moved from Texas seven years ago), (4) he lived and worked in Texas from 1996 to 1998, (5) he traveled here as recently as this past summer to attend and spend money at a gun show, and (6) he formed and actively participates in two Texas corporations.

McClain grew up in Florida. While he was in college, in 1994, his parents moved to Boerne, Texas, and McClain would visit them from time to time. McClain graduated from college in 1996 and went to work for American Express in San Antonio from late 1996 to early 1998. McClain lived with his parents in Boerne during that time, and he applied for and received a Texas driver's license. The current Boerne address on McClain's driver's license is a townhouse that his mother and father had rented, but McClain did not live there, and his parents no longer live there. McClain moved to Atlanta, Georgia in 1998. Some time after that, he lived in Illinois. He currently lives in Savannah, Georgia, and has for two years. He testified that he renewed his Texas driver's license in 2002 or 2004 when he was in town visiting his parents in Boerne, even though he was living in Illinois at the time. McClain owns no real property in Texas, and has never physically registered to vote in Texas.

McClain testified that he opened a brokerage account at First London in Dallas "probably two years ago." He testified that between five and ten percent of his net worth (excluding his ownership interest in Argyll) is held in the account, that it has had between $500,000 and a million dollars and that there is currently between $100,000 and $500,000 in the account. He stated that he trades in it "minimally," that to execute a trade he calls his broker in Dallas, and that the last time he executed any trades or transactions in the account was six months to a year ago, but that initially he traded more actively in the account, "maybe on a monthly basis." He also stated that he has traded on margin in the account, and had a margin call on the account and deposited cash into the ac-

count to satisfy the debt. McClain does not have any other bank accounts in Texas.

McClain testified that he returns to Texas occasionally to visit family and friends, and that sometimes he rents a car. McClain stated that he flew to Texas two months before his deposition for Argyll business meetings. McClain flew into San Antonio, then flew to Dallas for a few hours, and then flew back to Georgia. McClain testified that he flew into Texas for a gun show a couple of months before that, that he stayed overnight with his father, and that he purchased four guns. McClain visited Texas approximately six months before that, in 2004, for a funeral. McClain testified that his parents owned a house in Boerne until shortly before his deposition and that he saw them "maybe twice a year" for the holidays and other family events. McClain testified that he has siblings in Boerne. Overall, since McClain moved from Texas, he has traveled to Texas one to four times a year to visit family, depending on the year.

McClain testified that he formed Argyll with his business partner, James Miceli, in 2002. Argyll was organized in Texas as a limited liability company, and originally McClain was the only original member. Argyll is currently equally owned by McClain and Miceli. Argyll's principal place of business is in La Jolla, California. McClain also owns fifty percent of Southwest Argyll Investments, L.L.C., a Texas L.L.C. with its principal operations in La Jolla, California. Plaintiff also asserts that McClain was a principal of another Texas LLC, F.I.T. Management Group, L.L.C., which organized in 2001 and forfeited its existence in February 2005.

### B.

Plaintiff argues that, taken together, these contacts constitute sufficient contacts with Texas to establish general personal jurisdiction. McClain argues that his contacts with Texas are not substantial enough for general personal jurisdiction.

■ . To exercise general jurisdiction, the court must determine whether "the contacts are sufficiently systematic and continuous to support a reasonable exercise of jurisdiction." *Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773, 777 (5th Cir. 1986). The Court must consider the defendant's contacts *in toto* rather than examining each particular contact in isolation; though the individual contacts, standing alone, may be insufficient to support jurisdiction, a defendant's cumulative contacts with a forum may be sufficient to support jurisdiction. *Id.* at 779.

Plaintiff argues that McClain has not only chosen Texas as the state in which to form two limited liability companies, but he has also purposefully remained connected to Texas in his personal life despite no longer residing here. Plaintiff relies on a number of Texas cases, including *Schlobohm v. Schapiro,* 784 S.W.2d 355, 359 (Tex.1990), *Thorpe v. Volkert,* 882 S.W.2d 592, 597 (Tex.App.—Houston [1st Dist.] 1994, no writ), *Landecor v. Owen,* 2001 WL 737549 (Tex.App.—Dallas July 2, 2001, no pet.), *El Puerto de Liverpool, S.A. v. Servi Mundo Llantero, S.A.,* 82 S.W.3d 622 (Tex.App.—Corpus Christi 2002, pet. dism'd), and *Brocvielle v. Brocvielle,* 1998 WL 470488 (Tex.App.—Houston [1st Dist.] July 30, 1998, no pet.).

In *Schlobohm v. Schapiro,* 784 S.W.2d 355 (Tex.1990), the Texas Supreme Court found minimum contacts sufficient for general jurisdiction based on the fact that the defendant "became actively involved in a Texas business and voluntarily continued his commitment for almost two years. He was investor, stockholder, director, advisor, lender, and guarantor for [the Texas company]. He visited the state and main-

tained regular communications with some of its citizens." *Id.* at 359. The Court concluded that, considering the degree of his involvement, it was "difficult to believe that anyone in [the defendant's] position could have been surprised by the call to litigation in Texas" and found it "clear" that he had purposefully availed himself of the benefits of the forum. *Id.* The defendant, Schapiro, conducted the company's first meeting in Dallas, kept the corporate records at his attorney's office in Pittsburgh, guaranteed some of its leases, visited Dallas to obtain financing (signing a promissory note in his individual capacity for $136,702.10, owning the equipment purchased with the money and leasing it to the company), loaned an estimated total of $474,000 to the business, eventually became the sole director and sole shareholder, and occasionally visited Dallas.

In *Thorpe v. Volkert,* 882 S.W.2d 592, 597 (Tex.App.—Houston [1st Dist.] 1994, no writ), the First Court of Appeals wrote: "Defendant Thorpe was an investor, stockholder, director, advisor, and negotiator for All–American. His correspondence in connection with the contracts related to this litigation—on stationary bearing the All–American letterhead and Houston address—also reflects he was actively involved in the business. Additionally, he was a director of another Texas corporation. He visited Texas and maintained regular communications with Texas citizens. We conclude his contacts with this state were sufficient to subject him to the jurisdiction of a Texas court, and that the assertion of jurisdiction comports with fair play and substantial justice."

Plaintiff also relies on *Landecor v. Owen,* 2001 WL 737549 *2 (Tex.App.—Dallas 2001, no pet.), in which the Fifth Court of Appeals held that personal jurisdiction was proper over a defendant who lived in Texas ten years prior to the suit,

maintained a current drivers license, traveled to Texas frequently since moving from Texas, and was licensed as an attorney in the state.

With regard to McClain's brokerage account, Plaintiff cites *El Puerto de Liverpool, S.A. v. Servi Mundo Llantero, S.A.,* 82 S.W.3d 622 (Tex.App.—Corpus Christi 2002, pet dism'd). There, the court stated that whether a defendant possesses a bank account in Texas "is a factor traditionally considered in determining whether that defendant is subject to the general jurisdiction of the State." *Id.* at 633. It continued, "[c]onsonant with the other queries regarding general jurisdiction, the courts analyzing this issue focus on the quality and nature of the defendant's contacts with the forum state. In accordance with the standard rules regarding minimum contact analysis, use of the account must be continuous and systematic in order to support the exercise of general jurisdiction." Thus, it affirmed the district court's finding of general personal jurisdiction based on the defendant's maintenance of a Texas bank account for a period of five years with numerous and repeated transactions, in addition to its relationship with its subsidiaries in Texas.

Plaintiff also cites *Brocvielle v. Brocvielle,* 1998 WL 470488 (Tex.App.—Houston [1st Dist.] July 30, 1998, no pet.) (unpublished). In that case, the court affirmed the lower court's holding that general personal jurisdiction was proper: "Mr. Brocvielle lived in Houston, Texas from 1989 until September 1992. During that time he worked for Schlumberger. On June 25, 1992, he married Mrs. Brocvielle, and they resided in Harris County until September 1992. While living in Houston, Mr. Brocvielle opened an account with a Houston office of Merrill Lynch. He has regularly, continuously, and actively traded in that account and has regularly communicated

with his broker regarding transactions. In 1996, Mr. Brocvielle returned to Houston to terminate his employment with Schlumberger. He accrued employee benefits while working for Schlumberger and receives a monthly pension from his former employer. He maintains an account with Schlumberger Credit Union."

Though these cases lend some support to Plaintiff's position, whether an exercise of personal jurisdiction comports with due process is a question of federal law, and thus these decisions are not binding precedent on lower federal courts such as this one. Further, *Schlobohm v. Schapiro* is distinguishable from this case because the company was not only organized in Texas, it had its principal (and apparently only) operations in Texas, and thus Schapiro's involvement with the company necessarily involved ongoing and significant contacts with Texas. *Thorpe* is similarly distinguishable. *Landecor* turned on the fact that the defendant was licensed to practice in Texas and was a member in good standing of the State Bar of Texas for over thirty years.

The Court finds that *Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773 (5th Cir. 1986), provides the proper guidance concerning the outcome of this case. In *Holt Oil & Gas Corp. v. Harvey,* the Fifth Circuit found that the defendant had sufficient contacts with Texas to support an exercise of general jurisdiction. The Fifth Circuit reasoned as follows:

> Harvey's general contacts with Texas include the following: (1) Harvey attended college and was formerly employed in Texas; (2) Harvey owns real estate in Texas, specifically a condominium in Houston; (3) Harvey has traveled to Texas on numerous occasions to visit his children; (4) Harvey frequently visits Texas for recreation; and (5) Harvey has transacted a great deal of business in Texas. In addition to his transaction with Holt, Harvey has had extensive business dealings with Permian Records of Dallas, Texas. Harvey has been a director of Permian Records and has attended director's meetings in Dallas. Harvey has also invested $250,000.00 in Permian Records. Finally, Harvey is the sole shareholder of Marlin Oil Company. Marlin Oil has drilled several wells in Texas and been involved in litigation in Texas. Harvey has travelled to Texas on several occasions in connection with the activities of Marlin Oil.

None of Harvey's various contacts with Texas, alone, would support an exercise of general jurisdiction. For example, Harvey's frequent journeys into Texas for personal and recreational purposes would not by themselves constitute the level of contact which must exist for general jurisdiction to lie. *See generally Laxalt v. McClatchy,* 622 F.Supp. 737, 745 (D.Nev.1985); *cf. Helicopteros Nacionales,* 104 S.Ct. at 1874 (purchasing trips into the forum insufficient to support assertion of general jurisdiction). Similarly, Harvey's ownership of realty in the forum unrelated to this litigation would not alone support an exercise of general jurisdiction. *See Shaffer v. Heitner,* 433 U.S. 186, 208–10, 97 S.Ct. 2569, 2581–82, 53 L.Ed.2d 683 (1977). Nor would Harvey's status as an investor and former director of a Texas corporation alone be sufficient. *See id.* at 210, 97 S.Ct. at 2585–86.

Determining the existence of personal jurisdiction does not, however, involve an examination of each of Harvey's contacts with Texas viewed in isolation from one another. Rather we are required to examine Harvey's contacts in toto to determine whether they constitute the kind of continuous and systematic contacts required to satisfy due process.

The record reveals that Harvey has maintained constant and extensive personal and business connections with Texas throughout his adult life. These contacts differ both qualitatively and quantitatively from the sort of "random," "fortuitous," or "attenuated" contacts which will not support an exercise of in personam jurisdiction. Moreover, we note that the instant controversy arises out of one of Harvey's business contacts with Texas. While that contact was not sufficient to support an exercise of specific jurisdiction, the fact that some connection exists between Harvey, the forum, and the controversy involved in the instant case is nevertheless relevant to our determination. Based on the foregoing analysis, we conclude that Harvey had sufficient minimum contacts with Texas to support an exercise of in personam jurisdiction.

*Id.* at 779 (footnotes omitted).[6] The Fifth Circuit acknowledged that "the issue [was] close." *Id.* at 778.

 In this case, Plaintiff did not attend college in Texas but was employed here (for less than two years). He owns no real estate in Texas, but does maintain a brokerage account here. Further, he travels here to visit family and has traveled here for recreation, though there is no indication that his recreational visits occur "frequently" as in *Holt*. McClain testified that he traveled to Dallas one and a half years ago to visit a friend. Depo at 66. He also traveled here for a gun show and stayed one night, but otherwise there is no evidence of recreational visits to Texas (aside from family-related visits).

This case is distinguishable from *Holt* on the basis that Plaintiff has not demonstrated that McClain "has transacted a great deal of business in Texas" as the defendant in *Holt* did. While the defendant in *Holt* had "extensive business dealings with" a Texas company and was the sole shareholder of another Texas-based company that had drilled several wells in Texas, Plaintiff has failed to show that McClain has transacted much business in Texas. Though Argyll is organized under Texas law, its principal offices are not located in Texas, and there is no indication that McClain has transacted a great deal of business in Texas through Argyll or with any other company. McClain stated in his affidavit that meetings of Argyll's board of directors are held in California and "key business decisions for Argyll" are also made there. He also stated that Argyll does not solicit business directly from Texas. Further, there is no indication that Argyll conducts much business in Texas. According to McClain, he traveled to Dallas two months before his deposition for a "private project" for Argyll that entailed a

**6.** In *Shaffer v. Heitner,* 433 U.S. 186, 208, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), the Supreme Court noted that the presence of property in a state may bear on the existence of jurisdiction by providing contacts among the forum state, the defendant, and the litigation. The Court also held that the defendants' holdings in Greyhound, standing alone, were insufficient to confer jurisdiction. *Id.* at 203, 97 S.Ct. 2569. The plaintiff argued that the defendants' positions as directors and officers of a corporation chartered in Delaware provided sufficient contacts with the state to confer jurisdiction. The Court, however, concluded that the fact that defendants chose to be officers and directors of a corporation demonstrated only that it was appropriate for that state's laws to govern their obligations to its stockholders, and did not demonstrate that the defendants had purposefully availed themselves of the privilege of conducting activities within the forum state. *Id.* at 216, 97 S.Ct. 2569. Because the defendants "simply had nothing to do" with the state and it strained reason to suggest that anyone buying securities in a corporation formed in a state impliedly consents to subject himself to that state's jurisdiction on any cause of action, the Court found no basis for personal jurisdiction. *Id.*

meeting in Dallas with several people involved in that project. Depo at 23. McClain testified that Argyll "may have contracted a loan to a resident in Texas." Depo at 74. There is no other evidence that Argyll conducted business in Texas.

In addition to his ownership interest in Argyll Equities, McClain owns a fifty percent interest in Southwest Argyll Investments, a Texas LLC with its principal place of business in California. He testified that Southwest has not generated any revenue and "doesn't really do any business either." Depo at 34–35. None of the Argyll entities has ever had a principal place of business in Texas. Depo at 34. At the time McClain formed Argyll Equities, he was living in Illinois. McClain contributed a "minimal" amount of capital to the formation of Argyll via a bank account in Chicago, and has not contributed any additional capital. Depo at 39. McClain testified that he chose to organize Argyll Equities under Texas law based on "legal advice." Depo at 40. Argyll Equities has five or six employees, all located in California. Depo at 42. None of the other Argyll entities have employees. Argyll Equities maintains assets in Illinois and California. Depo at 46. Though Argyll has an address in Boerne, it does not own or lease space on that property, though it does receive some mail there. Depo at 54. The mail is forwarded to California or Georgia. Argyll does not keep any files in Texas. Depo at 73. Further, Plaintiff has provided the Court with no evidence concerning McClain's involvement with F.I.T.

The Court concludes that this case presents a weaker case for exercising general personal jurisdiction than the facts in *Holt,* which the Fifth Circuit had characterized as "close." [7] Accordingly, the Court finds that McClain's contacts with Texas are insufficient to allow this Court to exercise general jurisdiction.

In addition, the Court concludes that McClain's contacts with Texas related to this litigation are insufficient to establish specific jurisdiction. McClain negotiated and finalized the loan documents, but did so outside of Texas. Documents were faxed between Florida and the California and Georgia offices of Argyll, and all phone communication was between Florida and Georgia. The loan documents were signed in Georgia by McClain and in Florida by Paolino, and all amendments and exhibits to the loan documents were notarized in Florida. Paolino's lawyer made changes to the loan documents in New Jersey. These contacts are insufficient for specific jurisdiction. Further, as discussed above, RICO does not provide a basis for exercising personal jurisdiction. Accordingly, McClain's amended motion to dismiss for lack of personal jurisdiction (docket no. 55) is GRANTED.

### V. Defendant James Miceli's Rule 12(b) Motion to Dismiss (docket no. 53)

Defendant James Miceli, CEO of Argyll, moves to dismiss under Rule 12(b)(2) for lack of personal jurisdiction. As with McClain, Plaintiff alleges that during the period of negotiation of the loan modifica-

---

7. Though McClain has maintained a Texas driver's license, the Court does not find this fact to tip the scales in favor of general jurisdiction. *See Luker v. Luker,* 776 S.W.2d 624, 625 (Tex.App.—Texarkana 1989, writ denied)("The mere possession of a driver's license issued by the state does not satisfy the requirement of availing oneself of the benefits and protections of Texas."). Though main-

taining a license in Texas is a connection to Texas, Plaintiff has not shown that McClain's maintaining the license required any contacts with Texas other than the one-time renewal. Further, the brokerage account in Dallas also fails to compel a finding of jurisdiction, even when considered, as it must be, in combination with McClain's other contacts.

tion agreement, Miceli represented to Paolino in principal-to-principal conversations that no action would be taken with regard to his stock.

Miceli asserts that he lives and works in California and does not have continuous and systematic contacts with Texas sufficient to confer general personal jurisdiction. He was not involved in the loan transaction in April 2004. Miceli states that he never spoke to Paolino before the alleged default in October 2004, and only then because Paolino called him in La Jolla, California. In connection with trying to renegotiate the loan after October, Miceli "may have spoken to" Paolino over the telephone three or four times at most. He states that it was his understanding that they had reached an agreement with Paolino in November 2004 that would have reinstated the loan and forgiven the default, but after Paolino's attorneys became involved, the deal fell through. Miceli argues that, even if there is personal jurisdiction over Argyll, which Argyll concedes, the fiduciary shield doctrine precludes attributing that jurisdiction to Miceli.

Paolino responds that personal jurisdiction exists under RICO's nationwide service of process provision and, alternatively, that he should be permitted to conduct discovery related to Miceli's Texas contacts, especially those not addressed by Miceli's affidavit. Paolino argues that although Miceli's affidavit states that he has been to Texas several times over the last few years and that all visits "had to do with the business of Argyll; and visits with Argyll's litigation counsel, Ken Nunley," these statements do not indicate whether Miceli's contacts with Texas on those occasions were limited to conducting business on behalf of Argyll and do not state the nature or purpose of the "visits with" Argyll's litigation counsel. Further, Miceli's affidavit does not make clear whether he ever previously owned property in Texas or currently has a leasehold interest in Texas, nor whether he has filed or defended any lawsuits here or formed any other business entities under Texas law or with offices in Texas.

Miceli's affidavit states that he has been the CEO of Argyll since its inception in 2002 and is a 50% stockholder. He resides in California and has since 2002, and works at Argyll's La Jolla office. He states that prior to this lawsuit, he has had "very few contacts with Texas, and all have been business contacts for Argyll." He has visited Texas "maybe four to six times over five years, and all visits have had to do with the business of Argyll and visits with Argyll's litigation counsel."

Miceli has insufficient contacts with Texas to establish either specific or personal jurisdiction. Further, Miceli's affidavit establishes that Plaintiff's request for additional discovery would not add significant facts. Even if Miceli did previously own property or currently leased property in Texas, those contacts would be insufficient for general jurisdiction. Moreover, his affidavit plainly states that all his contacts with Texas have been business contacts for Argyll, thus ruling out the other issues (such as whether Miceli has been involved in litigation in Texas or has established a business entity with an office in Texas) that Plaintiff seeks to pursue. The request for a stay to conduct jurisdictional discovery is DENIED. Miceli's motion to dismiss for lack of personal jurisdiction (docket no. 53) is GRANTED.

## VI. Conclusion

The Court finds that it cannot exercise personal jurisdiction over the remaining defendants under the Texas long-arm statute because they lack minimum contacts with the State. Further, because no Defendant is subject to this Court's jurisdiction, Plaintiff cannot utilize RICO's nation-

wide service of process provision to allow this Court to exercise jurisdiction based on the defendants' contacts with the United States.

Defendant Jeffrey Spanier and Defendant Amerifund's Rule 12(b) Motion to Dismiss for Lack of Jurisdiction, Improper Venue, Insufficiency of Process and Service of Process (docket no. 11) is GRANTED and all claims against these Defendants are DISMISSED WITHOUT PREJUDICE.

Defendant John Franczyk and Defendant Hussain, Egan, Bendersky & Franczyk, L.L.C.'s 12(b) Motion to Dismiss for Lack of Jurisdiction, Improper Venue, Insufficiency of Process and Service of Process (docket no. 14) is GRANTED and all claims against these Defendants are DISMISSED WITHOUT PREJUDICE.

Defendant Douglas McClain, Jr.'s Motion to Dismiss for Lack of Jurisdiction (docket no. 30) is DISMISSED AS MOOT. Defendant Douglas McClain, Jr.'s Amended Motion to Dismiss for Lack of Jurisdiction (docket no. 55) is GRANTED and all claims against McClain are DISMISSED WITHOUT PREJUDICE.

Defendant James Miceli's Motion to Dismiss for Lack of Jurisdiction (docket no. 53) is GRANTED and all claims against Defendant Miceli are DISMISSED WITHOUT PREJUDICE.

All other pending motions are DISMISSED AS MOOT. This Order resolves all remaining claims and issues.